# In the United States Court of Federal Claims

No. 09-75L

(Filed:  February 11, 2011)

_____

| | |
|---|---|
| KLAMATH TRIBE CLAIMS COMMITTEE,<br><br>                           Plaintiff,<br><br>        v.<br><br>THE UNITED STATES,<br><br>                           Defendant. | *  Tribal claims; Motion to dismiss under<br>*  RCFC 12; RCFC 12(b)(1) – lack of<br>*  jurisdiction; 28 U.S.C. § 2501 – six-year<br>*  statute of limitations; Claims arising in 1961<br>*  and 1973 held untimely; RCFC 12(b)(6) –<br>*  failure to state a claim; RCFC 19 – joinder<br>*  question resolved before reaching merits;<br>*  RCFC 19(a) – joinder where person's<br>*  absence prevents court from according<br>*  complete relief or where absentee has<br>*  interest relating to the subject matter of the<br>*  action; Klamath Tribes required party under<br>*  RCFC 19(a); Sovereign immunity; Invitation<br>*  to intervene under RCFC 24.<br>* |

_____

**OPINION**

_____

*Daniel H. Israel*, Boulder, CO, for plaintiff.

*Maureen E. Rudolph*, Environmental and Natural Resources Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Ignacia S. Moreno*, for defendant.

**ALLEGRA, Judge:**

The Klamath Tribe Claims Committee (Klamath Claims Committee or plaintiff) seeks damages owing to alleged takings and breaches of fiduciary duty by the Department of the Interior (Interior). It asserts that Interior has failed to disburse funds owed to tribal members and to safeguard treaty-based water rights associated with a dam. Defendant has moved to dismiss plaintiff's complaint, claiming, pursuant to RCFC 12(b)(1), that this court lacks jurisdiction, or, alternatively, pursuant to RCFC 12(b)(6), that the complaint fails to state a claim upon which relief can be granted. For the reasons that follow, the court, **GRANTS, IN PART**, this motion

and dismisses two of plaintiff's counts for lack of jurisdiction. As to the remaining counts, this court concludes, under RCFC 19, that a necessary party must be joined.

I.   BACKGROUND

A brief recitation of the facts provides necessary context.[1]

The United States and the Klamath Tribes (the Tribes) entered into a Treaty in 1864. *See* Treaty between the United States and the Klamath and Moadoc Tribes and Yahooskin Bank of Snake Indians, October 14, 1864, 16 Stat. 707 (the Treaty). Under this Treaty, the Tribes ceded their interest in approximately twelve million acres of land. The Tribes reserved to themselves a reservation of approximately 800,000 acres, along with "the exclusive right of taking fish in the streams and lakes, included in said reservation, and of gathering edible roots, seeds, and berries within its limits." *Id*. In exchange, the federal government gave the Tribes cash and goods worth approximately $300,000. It also committed to provide various services to the Tribes and to hold tribal assets in trust for the benefit of the Tribes and its members. *Id*. From 1890 to 1920, the Bureau of Indian Affairs (BIA) surveyed the reservation for its irrigation potential and constructed irrigation facilities. One such facility was a diversion dam, the Chiloquin Dam (the Dam), which diverted portions of the Sprague River into canals that served lands on the Williamson River and Upper Klamath Lake.

In 1954, Congress passed the Klamath Termination Act (the 1954 Act), Pub. L. No. 83-587, 68 Stat. 718 (codified, as amended, at 25 U.S.C. §§ 564-564x), which ended federal supervision over the Tribes' trust assets and tribal properties, and terminated the federal services furnished to the Tribes. As described by the Court of Claims in an earlier case –

> [t]he basic scheme of that statute . . . was to give each adult member whose name appeared on the final tribal roll an election between withdrawing from the tribe and having his interest in tribal property commuted to money to be paid to him, and, on the other hand, remaining in the tribe and participating in a non-governmental tribal management plan.

*Klamath & Modoc Tribes v. United States*, 436 F.2d 1008, 1010-11 (Ct. Cl. 1971).[2] Section 10 of the 1954 Act authorized the government to dispose of federally-owned property acquired for

---

[1] These facts are largely drawn from plaintiff's complaint, and, for purposes of this motion, are assumed to be correct. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

[2] The 1954 Act created a process in which a list of remaining and withdrawing members was prepared. *See* 1954 Act § 3 (codified at 25 U.S.C. § 564b). Upon publication of the final roll, the Act directed that "the rights or beneficial interests in tribal property of each person whose name appears on the roll shall constitute personal property." *See* 1954 Act § 4 (codified at 25 U.S.C. § 564c). The 1954 Act directed that $250 be distributed, per capita, to each

administration of the Tribes or to transfer this property to qualifying entities.  1954 Act §10 (codified at 25 U.S.C. § 564*i*).  Other provisions in this statute dealt with the federally-owned and operated irrigation facilities on the Klamath Reservation, which included the Dam.  For example, section 13(a) of the 1954 Act authorized the Secretary to transfer the "care, operation and maintenance" of irrigation works to water users associations or irrigation districts.  1954 Act § 13(a) (codified at 25 U.S.C. § 564*l*(a)).

Section 13(c) of the 1954 Act "authorized to be appropriated" $89,212 for "payment to the Klamath Tribe[s]" at four percent interest "per annum," calculated from the date of disbursement.  1954 Act § 13(c) (codified at 25 U.S.C. § 564*l*(c)).  The 1954 Act stated that these funds were "reimbursement for tribal funds used for irrigation construction operation and maintenance benefitting nontribal lands on the Klamath Reservation."  *Id*.  It further directed the Secretary to transfer all personal property or funds that the United States held in trust, free of encumbrance, to tribal members within four years.  1954 Act § 8 (codified at 25 U.S.C. § 564g).  The Secretary was directed to arrange for the disposition of the Tribes' property within this same time period, with all tasks to be completed at the earliest practicable time, but not later than August 13, 1958.  1954 Act § 6(b) (codified at 25 U.S.C. § 564e(b)); *see also Klamath & Modoc Tribes*, 436 F.2d at 1011.  Once all restrictions on the Tribes' property were removed, the Secretary was to publish a proclamation in the Federal Register that the trust relationship between the Tribes and the United States was terminated.  1954 Act § 18 (codified at 25 U.S.C. § 564q).  Finally, the 1954 Act expressly preserved the Tribes' water and fishing rights as granted under the 1864 Treaty.  1954 Act § 14 (codified at 25 U.S.C. § 564m).

Following the passage of this legislation, approximately seventy-eight percent of the Tribes' members (1,660 of 2,133) chose to withdraw, and defendant used its authority under Section 10 of the Act to sell off much of the Tribes' property to pay out these withdrawing members.  *See Klamath & Modoc Tribe*, 436 F.3d at 1011.  The Secretary transferred the remaining tribal property to a private trustee to be maintained for those members who chose to remain with the Tribes.  In 1955, about a year after the passage of the 1954 Act, Congress appropriated funds to reimburse the Tribes for money used to construct, operate and maintain irrigation facilities benefiting non-tribal lands.  *See* Dept. of Interior and Related Agencies Appropriations Act of 1956, Pub. L. No. 84-78, ch. 147, 69 Stat. 141, 143 (June 16, 1955).[3]  In

---

individual listed on the final roll.  1954 Act § 7 (codified at 25 U.S.C. § 564f); *see Klamath & Modoc Tribes*, 436 F.2d at 1011.

[3]  One of the core issues in this case is whether defendant ever disbursed these funds.  Defendant submitted a 1958 report from the BIA's Portland office that lists the repayment to the Tribe under section 13(c) as "completed."  However, plaintiff submitted a 2008 request under the Freedom of Information Act, 5 U.S.C. § 552, to the BIA for an accounting regarding the distribution of section 13(c) funds, to which the BIA responded that "no responsive records could be located."

- 3 -


1961, the Secretary published a notice in the Federal Registrar stating that the federal government's relationship with the Tribe was officially terminated.  26 Fed. Reg. 7,362 (Aug. 12, 1961).

On August 21, 1961, the Tribes' governing body passed a resolution giving the Klamath Claims Committee authority to pursue certain claims against the United States.  *See* Joint Resolution of Tribal Councils March 2008 (describing the earlier resolution).  More specifically, the Klamath Claims Committee represents all 2,133 individuals who appeared on the rolls of the Tribes as of the date of their termination under the 1954 Act – both those who withdrew and those who chose to remain.  In 1961, the Tribes and several individuals (both withdrawing and remaining members for themselves and as representatives for similarly-situated individuals) filed suit against the United States in the U.S. Court of Claims alleging that the United States effectuated a taking in implementing the Termination Act.  *Klamath & Modoc Tribes*, 436 F.2d at 1012.  In 1962, seventy-three withdrawn members filed a similar suit.  *Id*. at 1013.  The Court of Claims consolidated the two cases in 1964.  *Id*. at 1010.  It later dismissed some of the claims, allowed others to proceed, and remanded the case back to the trial commissioner for further proceedings.  *Id*. at 1022.  The takings claims were eventually settled for $23 million.  *See Klamath & Modoc Tribes v. United States*, Nos. 125-61, 87-62 (Ct. Cl. Sept. 18, 1972), Order at 2-3.  The settlement was effectuated, in part, by legislation passed by Congress in 1965.[4]

Although the government-to-government relationship between the Tribes and the United States ceased in 1961, BIA took several years to conclude operations and transfer the Dam and other irrigation project facilities.  In 1973, Interior transferred title to the Dam to the Modoc Point Irrigation District (MPID), a non-federal entity chartered under Oregon law, made up of landowners.  MPID accepted the transfer in 1974.  *See* Operation and Maintenance Charges, Deletion of Needless Regulations, 44 Fed. Reg. 12,192 (Mar. 6, 1979).  In 1979, BIA published a notice deleting all the regulations pertaining to the irrigation system in light of the 1973 transfer of ownership to the MPID.  *Id.*  Nevertheless, several court decisions at or around this time confirmed that the Tribes' rights to certain natural resources under the 1864 Treaty survived the passage of the Termination Act.  *See Kimball v. Callahan*, 493 F.2d 564 (9th Cir. 1974), *cert. denied*, 419 U.S. 1019 (1974) (treaty-reserved hunting and fishing rights on former reservation lands survived termination); *United States v. Adair*, 723 F.2d 1394 (9th Cir. 1983), *cert. denied*, 476 U.S. 1252 (1983) (same as to implied reserved water rights).

In 1986, Congress passed the Klamath Indian Tribe Restoration Act (the Restoration Act), Pub. L. No. 99-398, 100 Stat. 849 (Aug. 27, 1986) (codified at 25 U.S.C. § 566),

---

[4] The Klamath Judgment Distribution Act of 1965, Pub. L. No. 89-224, 79 Stat. 897 (codified, as amended, at 25 U.S.C. §§ 565-565g), addressed various claims that the Tribes had pursued against the United States.  The law authorized funds to be used in settling these claims.  *Id*.  As part of this Act, the BIA could retain funds for the benefit of the Tribes "or any of its constituent parts or groups" for the purpose of "paying unusual and accustomed expenses prosecuting claims against the United States."  25 U.S.C. § 565.

reestablishing federal recognition of the Tribes.  While the Restoration Act restored the Tribes' federal services, as well as the government-to-government relationship between the Tribe and the United States, it did not alter existing property rights.  *See* 25 U.S.C. § 566(d).  According to certain tribal documents, the United States' recognition of the Tribes did not change the responsibilities of the Klamath Claims Committee.  *See* Klamath Tribe Executive Resolution, July 1993.

Throughout the post-termination and subsequent restoration period, the Klamath Claims Committee believed that it had broad authority to represent the Tribe and its members in tribal litigation.  Several resolutions of the Committee reflect this.  Among these is a 1983 resolution that states that the Tribes' August 21, 1961, grant of authority designated the Klamath Claims Committee as "the post-termination representative body of the Tribe" with respect to the "supervision and management of tribal claims against the United States for all dealings."  Klamath Claims Committee Resolution, January 1983; *see also* Klamath Claims Committee Resolutions, June 1996; Klamath Claims Committee Resolution, May 1996.  In 1993, the Tribes authorized plaintiff to work with BIA to disburse judgments from cases in which plaintiff, acting on behalf of the 1954 membership, was successful.  *See* Klamath Tribe Executive Resolution, July 1993.  More recently, the governing body of the Tribes reaffirmed the Klamath Claims Committee's role in tribal ligation when it authorized the Committee to use funds to "pursue claims, including but not limited to claims now being prosecuted against PacifiCorp."  *See* Joint Resolution of Tribal Council, March 2008.[5]  This resolution, however, did not give the Claims Committee exclusive authority to pursue the Pacificorp litigation, as it envisioned that the Tribes would also participate in that litigation.  *Id.*  The same resolution indicated that, to the extent that the Claims Committee pursued "other claims" outside of the Pacificorp case, it must act "within [its] authority as established by the General Counsel."  *Id.*[6]

In the late 1980s, Interior determined that the Dam and its fish ladder were adversely affecting several fish species listed as "endangered" under the Endangered Species Act of 1973, 87 Stat. 884, 16 U.S.C. § 1531 *et seq.*  In 2001, Congress authorized a study to assess alternatives for improving fish passage at the Dam.  *See* Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, § 10905 116 Stat. 134, 537.  After consulting with the MPID and the Tribes, Interior determined that removing the Dam was the best course of action.  In 2006,

---

[5] In their suit against Pacificorp, the Tribes sought damages for the disruption of salmon fish runs resulting from the construction and operation of government-authorized hydroelectric dams on the Klamath River.  *See Klamath Tribes of Or. v. Pacificorp*, 2005 WL 1661821 (D. Or. July 13, 2005), *aff'd*, 268 Fed. Appx. 575 (9th Cir.), *cert. denied*, 129 S. Ct. 109 (2008).

[6] The United States and the Tribes jointly filed water rights claims as part of Oregon's adjudication of the Klamath River Basin.  This adjudication will conclusively quantify, pursuant to the McCarran Amendment, the water rights recognized in *Adair* and held in trust by the United States for the Tribes.  43 U.S.C. § 666; *United States v. Oregon*, 44 F.3d 758 (9th Cir. 1994), *cert. denied sub nom., Klamath Tribes v. Oregon*, 516 U.S. 943 (1995).

BIA negotiated a cooperative agreement with MPID under which Interior would pay for removal of the Dam and construction of an alternative electric pump plant for irrigation. MPID landowners voted in favor of Dam removal, and signed a cooperative agreement with the BIA. Removal was completed in August 2008.

Plaintiff filed its initial complaint with the court on February 6, 2009, and an amended complaint on March 17, 2009. The latter alleges four causes of action: (i) a taking of Indian trust assets based on the government's failure to reimburse the Tribes as authorized by section 13 of the Termination Act; (ii) a breach of fiduciary duty based on the failure to disburse the section 13 authorized funds; (iii) a taking based on the removal of the Chiloquin Dam and its associated water storage;[7] and (iv) a breach of fiduciary duty based on the removal of the Dam and its associated water storage. Plaintiff asserts that this court possesses jurisdiction over these claims under the Indian Tucker Act, 28 U.S.C. § 1505. On May 7, 2009, defendant filed a motion to dismiss under RCFC 12(b)(1) and (6). On June 21, 2009, plaintiff filed its response to defendant's motion to dismiss and a cross-motion for summary judgment. Briefing and oral argument on these motions have now been completed.

## II.   DISCUSSION

Deciding a motion to dismiss "starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997); *see also Bell Atl. Corp.*, 550 U.S. at 555. The plaintiff must establish that the court has subject matter jurisdiction over its claims. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988); *Hansen v. United States*, 65 Fed. Cl. 76, 94 (2005). The court may look beyond the pleadings and "inquire into jurisdictional facts" to determine whether jurisdiction exists. *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991). RCFC 12(d) provides that if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment." But, this provision "does not apply to a motion under Rule 12(b)(1) to dismiss for lack of jurisdiction over the subject matter," under which the court undoubtedly may "address matters outside the pleadings." *Reed Island-MLC, Inc. v. United States*, 67 Fed. Cl. 27, 32 (2005) (citing *Toxgon Corp. v. BNFL, Inc.*, 312 F.3d 1379, 1383 (Fed. Cir. 2002)); *see also Petro-Hunt, L.L.C. v. United States*, 90 Fed. Cl. 51, 58 (2009).

To survive a motion to dismiss for failure to state a claim under RCFC 12(b)(6), the complaint, in addition, must have sufficient "facial plausibility" to "allow [ ] the court to draw the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949

---

[7] Plaintiff's briefs also assert that it is entitled to damages associated with the loss of fishing rights; those rights, however, are not referenced in the amended complaint. For purposes of this motion, the court will assume, *arguendo*, that these fishing rights were impacted by the loss of the water storage associated with the Dam. Should this case proceed to the merits, however, this matter will need to be clarified.

(2009); *see also Colida v. Nokia, Inc.*, 347 Fed. Appx. 568, 569-70 (Fed. Cir. 2009). The plaintiff's factual allegations must "raise a right to relief above the speculative level" and cross "the line from conceivable to plausible." *Bell Atl. Corp.*, 550 U.S. at 555; *see also Dobyns v. United States*, 91 Fed. Cl. 412, 422-28 (2010) (examining this pleading standard). Nevertheless, the Federal Circuit has recently reiterated that "[i]n ruling on a 12(b)(6) motion to dismiss, the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff." *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009); *see also Bank of Guam v. United States*, 578 F.3d 1318, 1326 (Fed. Cir. 2009), *cert. denied*, 2010 WL 1024020 (June 21, 2010); *Petro-Hunt, L.L.C. v. United States*, 90 Fed. Cl. 51, 68 (2009).

### A.   Statute of Limitations

The Tucker Act gives this court jurisdiction to award damages upon proof of "any claim against the United States founded either upon the Constitution, or any Act of Congress," 28 U.S.C. § 1491(a). A companion statute, the Indian Tucker Act, confers a like waiver for Indian tribal claims that "otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe." 28 U.S.C. § 1505; *see United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472-73 (2003); *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003). This court has jurisdiction over this case under a combination of these provisions. *See Klamath and Modoc Tribes*, 436 F.2d at 1013.

A claimant must bring a claim under either of these provisions "within six years after such claim first accrues." 28 U.S.C. § 2501; *see also Samish Indian Nation v. United States*, 419 F.3d 1355, 1369 (Fed. Cir. 2005). This is a jurisdictional limit that cannot be waived. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 136 (2008). It is well-established that a claim accrues under section 2501 "when 'all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for [its] money.'" *Martinez v. United States*, 333 F.3d 1295, 1303 (Fed. Cir. 2003) (en banc), *cert. denied*, 540 U.S. 1177 (2004) (quoting *Nager Elec. Co. v. United States*, 368 F.2d 847, 851 (Ct. Cl. 1966)); *see also Samish*, 419 F.3d at 1369. Because, as noted, this requirement is jurisdictional, plaintiff bears the burden of demonstrating that its claims were timely. *See Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998); *Entines v. United States*, 39 Fed. Cl. 673, 678 (1997), *cert. denied*, 526 U.S. 1117 (1999); *see also John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1362 (Fed. Cir. 2006) (Newman, J., dissenting); *Reynolds*, 846 F.2d at 748.[8]

---

[8] *See also Kingman Reef Atoll Invs., L.L.C. v. United States*, 541 F.3d 1189, 1197 (9th Cir. 2008) ("Although ordinarily the defendant bears the burden of proving an affirmative statute of limitations defense, here the statute of limitations is jurisdictional, and, '[w]hen subject matter jurisdiction is challenged under Federal Rule of Procedure 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion.'" (quoting *Tosco Corp. v. Comtys. for a Better Env't*, 236 F.3d 495, 499 (9th Cir. 2001))).

Two of plaintiff's claims fall well outside the six-year window established by section 2501.  The first of these involves its claim to disbursements required by section 13 of the 1954 Act – specifically, the $89,212, plus interest, plaintiff asserts it is still owed as reimbursement for the costs incurred by the Tribes in past construction, operation and maintenance of the Klamath Irrigation Project.  Disbursement of these funds was originally to be completed not later than August 13, 1958.  *See* 1954 Act, § 6(b), 68 Stat. 719 (1954), 25 U.S.C. § 564e(b); *see also Klamath & Modoc Tribes*, 436 F.2d at 1011.  Congress later extended this deadline – first in 1957, to August 13, 1960, 71 Stat. 347 (1957), and then in 1958, to August 13, 1961, 72 Stat. 816 (1958).  Any claims with respect to the disbursements thus accrued as of August 13, 1961, requiring that any lawsuit with respect thereto be brought within six years of that date.[9]  Indeed, as discussed above, it appears that several such suits were brought in the Court of Claims in 1961 and 1962.  This suit, however, was not filed until 2009, long after the statute of limitations on any disbursement claim had run.

Plaintiff's claims relating to the transfer of the Chiloquin Dam fare no better.  In these claims, plaintiff seeks the replacement cost of the Dam, plus interest.  But, Interior transferred the Dam to the MPID in 1973 – more than twenty-six years before this lawsuit was filed.[10]  Accordingly, any such claims also fall well outside the six-year statute of limitations established by 28 U.S.C. § 2501, and must be dismissed for lack of jurisdiction.

### B.   RCFC 19 – Joinder of the Tribes

The remainder of plaintiff's claims relate to the removal of the Dam in August of 2008.  More specifically, plaintiff asserts that the removal of the Dam effectuated a taking of the Tribes' associated water and fishing rights and constituted a breach of the fiduciary duties established by the 1864 Treaty and the 1954 Act.  It would appear that this court has jurisdiction over these claims under 28 U.S.C. §§ 1491 and 1505, and that they are timely under 28 U.S.C. § 2501.  Defendant, nonetheless, challenges these counts, asserting that they fail to state a claim under RCFC 12(b)(6).  Defendant's filings, however, beg another, more preliminary issue – whether, under RCFC 19, parties necessary to the resolution of this case must yet be joined herein.

"Compulsory joinder is an exception to the general practice of giving [a] plaintiff the right to decide who shall be the parties to a lawsuit."  7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1602 (2001) (hereinafter "Federal Practice &

---

[9] Plaintiff asserts that there was no deadline for this disbursement.  But, the Court of Claims concluded otherwise in *Klamath and Modoc Tribes*.  There, the court stated that "the distribution of the proceeds" was "to be completed at the earliest practicable time but not later than August 13, 1958."  426 F.2d at 1011.  The opinion in *Klamath and Modoc Tribes* then catalogued the legislative extensions of this deadline and the reasons therefor.  *Id*. at 1011-13.

[10] On brief, plaintiff claims that the actual transfer of the Dam did not occur until 2007.  But, it has provided no support for this assertion.

Procedure"). Like its counterpart in the Federal Rules of Civil Procedure, RCFC 19(a)(1), entitled "Joinder of Persons Needed for Just Adjudication," instructs –

> A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
>
>> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>>
>>> (i) as a practical matter impair or impede the person's ability to protect the interest; or
>>>
>>> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

*Cf.* Fed. R. Civ. P. 19(a); *see Philippines v. Pimentel*, 553 U.S. 851, 862 (2008) (noting that Rule 19(a) "states the principles that determine whether persons or entities must be joined in a suit"); 7 Federal Practice & Procedure § 1604. Where joinder is not feasible, the court "must determine whether, in equity and good conscience, the action should proceed . . . ." The latter inquiry turns on a set of nonexclusive considerations mapped in RCFC 19(b).[11]

---

[11] In this regard, RCFC 19(b) states –

> The factors for the court to consider include:
>
> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
>
> (2) the extent to which any prejudice could be lessened or avoided by:
>
>> (A) protective provisions in the judgment;
>>
>> (B) shaping the relief; or
>>
>> (C) other measures;
>
> (3) whether a judgment rendered in the person's absence would be adequate; and
>
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

The structure of this rule exhibits an analytical sequence in which the court must initially determine whether a person meets one of the criteria listed in RCFC 19(a)(1); if that is so, but joinder is not feasible, the court must determine whether, under RCFC 19(b), the case should proceed or be dismissed. The D.C. Circuit has distilled this analysis into three sequential questions: "Should the absentee be joined? If the absentee should be joined, can the absentee be joined? If the absentee cannot be joined should the lawsuit proceed without her nonetheless?" *W. Md. Ry. Co. v. Harbor Ins. Co.*, 910 F.2d 960, 961 (D.C. Cir. 1990); *see also Glancy v. Taubman Ctrs., Inc.*, 373 F.3d 656, 666 (6th Cir. 2004).[12] Through this process, the rule "protect[s] the interests of absent persons as well as those already before the court from multiple litigation or inconsistent judicial determinations." 7 Federal Practice & Procedure at § 1602; *see also Shields v. Barrow*, 58 U.S. (17 How.) 130, 139 (1854) (describing similar protections); John W. Reed, "Compulsory Joinder of Parties in Civil Actions," 55 Mich. L. Rev. 327, 330 (1957).

The first joinder standard prescribed in RCFC 19(a)(1) protects existing parties by requiring the presence of all persons who have an interest in the litigation, so that any relief awarded will effectively and completed resolve the dispute. *See* Fed. R. Civ. P. 19 advisory committee's notes (1966); *Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 315 (3d Cir. 2007). This standard promotes judicial economy by "avoiding repeated lawsuits on the same essential subject matter." Fed. R. Civ. P. 19 advisory committee's notes (1966); *see also Gen. Refractories Co.*, 500 F.3d at 315; 7 Federal Practice & Procedure § 1604. A pertinent example of how this first alternative basis for compulsory joinder functions is *Keweenaw Bay Indian Community v. Michigan*, 11 F.3d 1341, 1346-47 (6th Cir. 1993), which involved a dispute over fishing rights originating in a treaty. There, the court affirmed a lower court ruling which held that where one band of a tribe brought suit again the state and individual members of two other bands, the absent bands had to be joined so that any relief granted would not be partial. *Id.*

---

*See also Philippines*, 553 U.S. at 863 (indicating that this determination is "case specific"); *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 118-19 (1968) (discussing the interests relevant to joinder).

[12] Although this terminology is no longer found in the rules, individuals whose joinder is obliged under RCFC 19(a) would have previously been called "necessary parties," while those whose absence would compel dismissal of the action under RCFC 19(b) would have been called "indispensable parties." The latter terminology was abandoned because it "had an unforgiving connotation that did not fit easily with a system that permits actions to proceed even when some persons who otherwise should be parties to the action cannot be joined." *Philippines*, 553 U.S. at 863. Though the language has changed, Rule 19(b) still creates the "'verbal anomaly'" of "[r]equired persons [who] may turn out not to be required for the action to proceed after all." *Philippines*, 553 U.S. at 863 (quoting *Provident Bank*, 390 U.S. at 117 n.12).

at 1347. In this regard, the court noted that "the two absent bands are signatories to the very treaty at issue in the action," adding that "[t]he likelihood that they would seek legal recourse in the event that the judgment deprived them of fishing rights to which they believe they are entitled can hardly be characterized as speculative." *Id.*; *see also Makah Indian Tribe v. Verity*, 910 F.2d 555, 558-59 (9th Cir. 1990) (absentee tribes that had treaty right in Columbia River salmon were necessary parties to action seeking higher ocean quota).

The second joinder standard prescribed in RCFC 19(a)(2) focuses more on the interests of those not before the court. It involves situations in which an absentee claims an interest in the subject matter of the action, and disposing of the case in that person's absence may prejudice either the parties before the court or the absentee. *See United Keetoowah Band of Cherokee Indians of Okla. v. United States*, 480 F.3d 1318, 1324 (Fed. Cir. 2007). While the "interest" referenced under this requirement may not be "indirect or contingent," *id.* at 1325, this clause "does not require the absent party to actually possess an interest," but merely requires that the absentee claim such an interest. *Davis v. United States*, 192 F.3d 951, 958 (10th Cir. 1999); *see also Shermoen v. United States*, 982 F.2d 1312, 1318 (9th Cir. 1992), *cert. denied*, 509 U.S. 902 (1993) (holding that the rule covers such claimed interests unless "patently frivolous"). This clause "recognizes the importance of protecting the person whose joinder is in question against the practical prejudice to him which may arise through a disposition of the action in his absence." Fed. R. Civ. P. 19 advisory committee's note (1966); *see also Evergreen Park Nursing & Convalescent Home, Inc. v. Am. Equitable Assurance Co.*, 417 F.2d 1113, 1115 (7th Cir. 1969); 7 Federal Practice & Procedure § 1604. It also recognizes "the need for considering whether a party may be left, after the adjudication, in a position where a person not joined can subject him to a double or otherwise inconsistent liability." Fed. R. Civ. P. 19 advisory committee's note (1966); *Willingham v. Star Cutter Co.*, 555 F.2d 1340, 1346 (6th Cir. 1977). A pertinent example of this second standard at work is *Davis*, 192 F.3d at 958-60. There, the Seminole Nation of Oklahoma claimed an interest in the subject matter of a suit brought by two bands of the Nation challenging their exclusion from a fund created by a judgment rendered by the Indian Claims Commission. *Id.* at 958-60. On the basis of this claimed interest, the court held that the Nation's presence was required under Rule 19(a)(2). *Id.* at 961.[13]

In the court's view, now is the time, *i.e.*, before any merits claims are resolved, to determine whether the Tribes should be joined in this action under RCFC 19.[14] While, strictly

---

[13] *See also Am. Greyhound Racing, Inc. v. Hall*, 305 F.3d 1015, 1024 (9th Cir. 2002) (Indian tribes with existing compacts with state for operating gaming casinos had interest in action brought to enjoin Governor of Arizona from entering into new gaming compacts that would expand the scope of Indian gaming); *Shermoen*, 982 F.2d at 1318 (Hoope Valley and Yurok Tribes had interest in outcome of action by individual Indians challenging the constitutionality of Hoopa-Yurok Settlement Act).

[14] The rules do not address whether concerns arising under RCFC 19 should be resolved prior to deciding a motion to dismiss under RCFC 12(b)(6). To be sure, RCFC 12(b)(7) indicates that defendant may file a motion to dismiss based upon the "failure to join a party

speaking, defendant has not moved for such joinder, it has, in its briefs, repeatedly challenged plaintiff's ability to bring this suit without the participation of the Tribes, asserting that plaintiff lacks "standing" to proceed independently.[15]

The record, in fact, suggests that there is an overlap between the membership and interests of the Tribes and the Klamath Claims Committee, particularly after the passage of the Restoration Act in 1986, which restored the Tribes' status. Several cases hold that the Tribes currently possess fishing and water rights that derive from the 1868 Treaty. *See Kimball*, 493 F.2d at 569 (fishing rights); *Adair*, 723 F.2d at 1410-1411 (water rights). While the exact contours of those rights remain to be determined elsewhere, it is essentially those same rights and associated fiduciary obligations – deriving from the same 1868 Treaty – that plaintiff seeks to vindicate in this case. *Cf. Keweenaw Bay Indian Cmty.*, 11 F.3d at 1347 (invoking Rule 19(a) based on multiple parties claiming rights under the same treaty). Indeed, research reveals several other cases in which the Tribes and plaintiff were both involved because they claimed similar interests. *See*, *e.g.*, *Klamath Tribes of Oregon v. PacifiCorp*, 2005 WL 1661821 (D. Or. July 13, 2005). Finally, when, at the court's request, plaintiff contacted the Tribes to obtain confirmation that it had the authority to pursue this litigation, the Chairman of the Tribes tellingly declined to provide that confirmation. In a letter dated June 17, 2010, the Chairman explained that the "Claims Committee was established during the Termination era before the restoration of federal recognition of the Tribes by the United States." He further stated that "[t]he Tribal Council simply is not, and I am not in a position to lend support to litigation over which the Klamath Tribes have no control, particularly where the litigation may potentially affect Tribal rights of the entire General Council membership."

---

under Rule 19." But, nothing in this provision suggests that a motion under RCFC 12(b)(6) must be considered before one under RCFC 12(b)(7). Nor is any such ordering implied by RCFC 12(h)(2), which indicates that a "[f]ailure to state claim upon which relief can be granted [or] to join a person required by Rule 19(b)" may be filed in a pleading under RCFC 7(a), a motion for judgment on the pleadings under RCFC 12(c) or at trial. Logic suggests that the concerns raised under RCFC 19(a) – that the court might not be able to accord complete relief among existing parties or that the absentee's ability to protect its interests may be impaired or impeded by a ruling – ought to be resolved before the court resolves any issues on the merits. *See Keweenaw Bay Indian Comty.*, 11 F.3d at 1348; *Tankerssley v. Albright*, 514 F.2d 956, 965-66 (7th Cir. 1975) ("[The interests served by Rule 19] must be weighed and the necessity or indispensability of absent persons determined prior to any consideration of the merits of a case."). Notably, it is well-established that questions involving jurisdiction, including the statute of limitations questions addressed above, should be resolved before the court considers the application of RCFC 19. *See Rosales v. United States*, 89 Fed. Cl. 565, 584 n.21 (2009).

[15] Even if defendant had not raised this issue, the court could consider the absence of a required person *sua sponte*. *See Philippines*, 553 U.S. at 860; *Minnesota v. Northern Secs. Co.*, 184 U.S. 199, 235 (1902); *see also Provident Tradesmens Bank*, 390 U.S. at 111.

Based on these facts, which are essentially uncontested, the court finds that, in the absence of the Tribes, it cannot afford complete relief as between plaintiff and the United States. In addition, the court finds that the Tribes have claimed an interest in the remaining subject matter of this lawsuit and that disposing of this case in the Tribes' absence may, as a practical matter, impede the Tribes' ability to protect that interest or leave the United States subject to inconsistent obligations. Accordingly, the court concludes that the Klamath Tribes are a party that should be joined to this action under RCFC 19(a). *See Washington v. Daley*, 173 F.3d 1158 (9th Cir. 1999) (joinder of absent tribes required where State sued Secretary of Commerce challenging fishing regulations that impacted fishing treaty rights); *Keweenaw Bay Indian Cmty.*, 11 F.3d at 1347 (same, but with respect to disputed fishing rights); *Makah Indian Tribe*, 910 F.2d at 559 (same, but with respect to federal regulations allocating salmon quotas); *see also* Nicholas V. Merkley, "Compulsory Party Joinder and Tribal Sovereign Immunity: A Proposal to Modify Federal Courts' Application of Rule 19 to Cases Involving Absent Tribes as 'Necessary' Parties," 56 Okla. L. Rev. 931, 944 (2003) (hereinafter "Compulsory Party Joinder and Tribal Sovereign Immunity").[16]

RCFC 19(a)(2) provides that "[i]f a person has not been joined as required, the court must order that the person be made a party," adding that "[a] person who refuses to join as a plaintiff may be made either a defendant or, in a proper case, an involuntary plaintiff." Various cases, however, have held that the comparable provision in the Federal Rules of Civil Procedure (Fed. R. Civ. P. 19(a)(2)) is not triggered where, owing to sovereign immunity considerations, the entity required to be joined cannot be compelled to do so. That situation arises where an Indian tribe is the absent party. *See* 7 Federal Practice & Procedure § 1617 (citing cases involving the United States and noting that "the sovereign immunity guaranteed Indian tribes has produced parallel party-joinder issues in other litigation in which a tribe's rights are implicated.").[17] While most cases of this ilk involve situations in which sovereign immunity prevents the addition of a

---

[16] In some cases, courts have held that absent tribes are not "necessary" parties under Rule 19 because the federal government may adequately represent the tribes' interest. These cases, however, hold this is true "only so long as 'no conflict exists between the United States and the nonparty beneficiaries.'" *Citizens Potowatomi Nation v. Norton*, 248 F.3d 993, 999 (10th Cir. 2001) (quoting *Davis*, 192 F.3d at 958). Here, it does not appear that the United States can adequately represent the interests of the absent Tribes, at least insofar as plaintiff claims that defendant's actions impaired the Tribes' water rights.

[17] As noted by the D.C. Circuit, "[t]he doctrine of tribal immunity, which recognizes the sovereignty of Indian tribes and seeks to preserve their autonomy, protects tribes from suits in federal and state courts." *Wichita & Affiliated Tribes of Okla. v. Hodel*, 788 F.2d 765, 771 (D.C. Cir. 1986); *see also Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978); *United States v. U.S. Fid. & Guar. Co.*, 309 U.S. 506, 512-13 (1940); "Compulsory Party Joinder and Tribal Sovereign Immunity," 56 Okla. L. Rev. at 940-42.

party as a defendant, others have recognized that a sovereign cannot be haled into court against its will, even as a plaintiff.[18]

Courts confronted with this problem have employed a two-step process: First, they extend an invitation to the absent party to intervene under Rule 24. If that invitation is accepted, the provisions of Rule 19(a) are satisfied and the case proceeds to the merits. *See*, *e.g.*, *Narragansett Tribe of Indians v. S. R.I. Land Dev. Corp.*, 418 F. Supp. 798, 810-11 (D.R.I. 1976).[19] If it is declined, the court moves to the second step, namely, a determination as to whether the absent sovereign is "indispensable." If an absent sovereign proves "indispensable," the case is then dismissed under Rule 19(b). *See Davis*, 343 F.3d at 1289; "Compulsory Party Joinder and Tribal Sovereign Immunity," 56 Okla. L. Rev. at 963-64. In the court's view, it makes good sense to employ this process here, mindful of the sovereignty of the Tribes involved.

## III.   CONCLUSION

Based on the foregoing, the court hereby **GRANTS, IN PART**, defendant's motion to dismiss under RCFC 12(b)(1), dismissing, for lack of jurisdiction, plaintiff's claims to the extent they seek compensation for the non-disbursement of funds relating to the 1954 Act and the transfer of the Dam in 1973. As to the remainder of plaintiff's claims, the court hereby extends an invitation to the Tribes to seek intervene in this lawsuit; any motion to intervene shall be filed

---

[18] *See Clinton v. Babbitt*, 180 F.3d 1081, 1090 (9th Cir. 1998) ("because the Hopi Tribe enjoys sovereign immunity . . . it cannot be joined as a party without its consent"); *Kescoli v. Babbitt*, 101 F.3d 1304, 1310 (9th Cir. 1996); *Wichita & Affiliated Tribes of Okla.*, 788 F.2d at 771 ("tribal immunity quickly surfaces as a crucial issue in such a suit since if the tribe is indispensable party, and cannot be joined due to its immunity, the claim may not proceed"); 7 Federal Practice & Procedure § 1617; *see also* "Compulsory Party Joinder and Tribal Sovereign Immunity," 56 Okla. L. Rev. at 948 ("Courts labeling absent tribes as necessary parties have recognized that tribal sovereign immunity prevents them from joining the tribes as parties to the lawsuit."). It, of course, makes no sense to issue an order under RCFC 19(a)(2) that is unenforceable. *Garpeg, Ltd. v. United States*, 583 F. Supp. 789, 799 (S.D.N.Y. 1984); Fed. Practice & Procedure § 2945 (courts will avoid "futile gesture" of issuing unenforceable order).

[19] Under RCFC 24(a), an absentee has a right to intervene when a statute confers the right or when it "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." As the Federal Circuit has observed, this standard is essentially identical to that in RCFC 19(a)(1)(B)(i). *See United Keetoowah Band*, 480 F.3d at 1324-25; *see also Klamath Irr. Dist. v. United States*, 64 Fed. Cl. 328, 329-30 (2005) ("By way of further analogy to the Federal Rules, the findings required by RCFC 24(a)(2) are identical to those required by RCFC 19(a)(2), dealing with joinder of person needed for just adjudications, revealing an obvious symmetry between these two gatekeeper provisions.").

on or before April 11, 2011.[20] Should the Tribes decline to participate in this lawsuit, the court will determine whether they are "indispensable" parties under RCFC 19(b). The Clerk is hereby ordered to effectuate service of this order on an appropriate official of the Klamath Tribes.

**IT IS SO ORDERED**.

                                         s/ Francis M. Allegra
                                         Francis M. Allegra
                                         Judge

---

[20] In lieu of such a motion, the Tribes may make such other filing (*e.g.*, a memorandum setting forth their position on the joinder issue) as they deem appropriate.