# In the United States Court of Federal Claims

No. 09-75L

(Filed:  July 16, 2012)
_____

| | |
|---|---|
| KLAMATH TRIBE CLAIMS COMMITTEE,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | * <br> * Tribal claims; RCFC 19 – joinder question;<br> * Tribal sovereign immunity; RCFC 19(b) –<br> * whether absence of sovereign, which cannot<br> * be joined in suit and declines invitation to<br> * intervene, requires dismissal; *Provident*;<br> * Lack of alternative remedy for plaintiff;<br> * Impact of sovereign immunity – *Pimentel*;<br> * Potential for conflicting claims; Inability of<br> * United States to represent Tribe's interest;<br> * No way to lessen prejudice associated with<br> * proceeding; Dismissal warranted.<br> *<br> *<br> * |

_____

**OPINION**
_____

*Thomas W. Fredericks*, Louisville, CO, for plaintiff.

*Maureen E. Rudolph*, Environmental and Natural Resources Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Ignacia S. Moreno*, for defendant.

**ALLEGRA, Judge:**

The Klamath Tribe Claims Committee (Klamath Claims Committee or plaintiff) seeks damages for alleged takings and breaches of fiduciary duty committed by the Department of the Interior (Interior).  It asserts that Interior has failed to disburse funds owed to tribal members and to safeguard treaty-based water rights associated with a dam.  On February 11, 2011, the court granted, in part, a motion filed by defendant, and dismissed two of plaintiff's counts for lack of jurisdiction.  As to the remaining counts, this court concluded, under RCFC 19, that a necessary

party, the Klamath Tribes (the Tribes)[1] must be joined.  Subsequently, the Tribes declined to participate in this lawsuit.  Accordingly, the court must now determine whether the Tribes is an indispensable party under RCFC 19(b).  For the reasons that follow, the court concludes that the Tribes, indeed, is an indispensable party and that the inability to join it in this lawsuit requires that the complaint be dismissed.

## I.      BACKGROUND

A brief recitation of the facts provides necessary context.

The United States and the Tribes entered into a Treaty in 1864.  *See* Treaty between the United States and the Klamath and Moadoc Tribes and Yahooskin Band of Snake Indians, October 14, 1864, 16 Stat. 707 (the Treaty).  Under this Treaty, the Tribes ceded their interest in approximately twelve million acres of land, reserving unto themselves approximately 800,000 acres, along with "the exclusive right of taking fish in the streams and lakes, included in said reservation, and of gathering edible roots, seeds, and berries within its limits."  *Id.*  In exchange, the federal government gave the Tribes cash and goods worth approximately $300,000.  It also committed to provide various services to the Tribes and to hold tribal assets in trust for the benefit of the Tribes and its members.  *Id.*  From 1890 to 1920, the Bureau of Indian Affairs (BIA) surveyed the reservation for its irrigation potential and constructed irrigation facilities.  One such facility was a diversion dam, the Chiloquin Dam (the Dam), that diverted portions of the Sprague River into canals which served lands on the Williamson River and Upper Klamath Lake.

In 1954, Congress passed the Klamath Termination Act (the 1954 Act), Pub. L. No. 83–587, 68 Stat. 718 (codified, as amended, at 25 U.S.C. §§ 564–564x), which ended federal supervision over the Tribes' trust assets and tribal properties, and terminated the federal services furnished to the Tribes.  As described by the Court of Claims in an earlier case –

> [t]he basic scheme of that statute . . . was to give each adult member whose name appeared on the final tribal roll an election between withdrawing from the tribe and having his interest in tribal property commuted to money to be paid to him, and, on the other hand, remaining in the tribe and participating in a nongovernmental tribal management plan.

---

[1]  The present-day Klamath Tribes is a single, federally-recognized tribal government that uses the plural "Tribes" to reflect the fact that it is composed of the Klamath and Modoc Tribes, and the Yahooskin Band of Snake Indians.  The court adopts the Tribes' convention of referring to itself in the singular.

*Klamath & Modoc Tribes v. United States*, 436 F.2d 1008, 1010–11 (Ct. Cl. 1971).[2]  Section 10 of the 1954 Act authorized the government to dispose of federally-owned property acquired for administration of the Tribes or to transfer this property to qualifying entities.  1954 Act § 10 (codified at 25 U.S.C. § 564i).  Other provisions in this statute dealt with the federally-owned and operated irrigation facilities on the Klamath Reservation, including the Dam.  For example, section 13(a) of the 1954 Act authorized the Secretary to transfer the "care, operation and maintenance" of irrigation works to water users associations or irrigation districts.  1954 Act § 13(a) (codified at 25 U.S.C. § 5641(a)).

Section 13(c) of the 1954 Act "authorized to be appropriated" $89,212 for "payment to the Klamath Tribe[s]" at four percent interest "per annum," calculated from the date of disbursement.  1954 Act § 13(c) (codified at 25 U.S.C. § 564l (c)).  The 1954 Act stated that these funds were "reimbursement for tribal funds used for irrigation, construction, operation and maintenance benefitting nontribal lands on the Klamath Reservation."  *Id*.  It further directed the Secretary to transfer all personal property or funds that the United States held in trust, free of encumbrance, to tribal members within four years.  1954 Act § 8 (codified at 25 U.S.C. § 564g).  The Secretary was directed to arrange for the disposition of the Tribes' property at the earliest practicable time, but not later than August 13, 1958.  1954 Act § 6(b) (codified at 25 U.S.C. § 564e(b)); *see also Klamath & Modoc Tribes*, 436 F.2d at 1011.  Once the restrictions on the Tribes' property were removed, the Secretary was to publish a proclamation in the Federal Register that the trust relationship between the Tribes and the United States was terminated.  1954 Act § 18 (codified at 25 U.S.C. § 564q).  Finally, the 1954 Act expressly preserved the Tribes' water and fishing rights as granted under the 1864 Treaty.  1954 Act § 14 (codified at 25 U.S.C. § 564m).

Following the passage of this legislation, approximately seventy-eight percent of the Tribes' members (1,660 of 2,133) chose to withdraw, and defendant used its authority under Section 10 of the Act to sell off much of the Tribes' property to pay these withdrawing members.  *See Klamath & Modoc Tribes*, 436 F.2d at 1011.  The Secretary transferred the remaining tribal property to a private trustee to be maintained for those members who chose to remain with the Tribes.  In 1955, about a year after the passage of the 1954 Act, Congress appropriated funds to reimburse the Tribes for money expended to construct, operate and maintain irrigation facilities benefiting non-tribal lands.  *See* Dept. of Interior and Related Agencies Appropriations Act of 1956, Pub. L. No. 84–78, ch. 147, 69 Stat. 141, 143 (June 16, 1955).  In 1961, the Secretary

---

[2]  The 1954 Act created a process in which a list of remaining and withdrawing members was prepared.  *See* 1954 Act § 3 (codified at 25 U.S.C. § 564b).  Upon publication of the final roll, the Act directed that "the rights or beneficial interests in tribal property of each person whose name appears on the roll shall constitute personal property."  *See* 1954 Act § 4 (codified at 25 U.S.C. § 564c).  The 1954 Act directed that $250 be distributed, per capita, to each individual listed on the final roll.  1954 Act § 7 (codified at 25 U.S.C. § 564f); *see Klamath & Modoc Tribes*, 436 F.2d at 1011.

published a notice in the Federal Registrar stating that the federal government's relationship with the Tribe was officially terminated.  26 Fed. Reg. 7,362 (Aug. 12, 1961).

On August 21, 1961, the Tribes' governing body passed a resolution giving the Klamath Claims Committee authority to pursue certain claims against the United States.  *See* Joint Resolution of Tribal Councils, March 2008 (describing the earlier resolution).  The Klamath Claims Committee represents all 2,133 individuals who appeared on the rolls of the Tribes as of the date of their termination under the 1954 Act.  In 1961, the Tribes and several individuals (both withdrawing and remaining members for themselves and as representatives for similarly-situated individuals) filed suit against the United States in the U.S. Court of Claims alleging that the United States effectuated a takings in implementing the 1954 Act.  *Klamath & Modoc Tribes*, 436 F.2d at 1012.  In 1962, seventy-three withdrawn members filed a similar suit.  *Id*. at 1013.  The Court of Claims consolidated the two cases in 1964.  *Id*. at 1010.  The takings claims were eventually settled for approximately $23.5 million.  *See Klamath & Modoc Tribes v. United States*, 199 Ct. Cl. 1024 (Ct. Cl. Sept. 18, 1972).  The settlement was effectuated, in part, via legislation passed by Congress in 1965.[3]

Although the government-to-government relationship between the Tribes and the United States ceased in 1961, BIA took several years to conclude operations and transfer its irrigation project facilities.  In 1973, Interior transferred title to the Dam to the Modoc Point Irrigation District (MPID), a non-federal entity chartered under Oregon law, made up of landowners.  MPID accepted the transfer in 1974.  *See* Operation and Maintenance Charges, Deletion of Needless Regulations, 44 Fed. Reg. 12,192 (Mar. 6, 1979).  In 1979, BIA published a notice deleting all the regulations pertaining to the irrigation system in light of the 1973 transfer of ownership to the MPID.  *Id*.  Nevertheless, several court decisions at or around this time confirmed that the Tribes' rights to certain natural resources under the 1864 Treaty survived the passage of the Termination Act.  *See Kimball v. Callahan*, 493 F.2d 564 (9th Cir.), *cert. denied,* 419 U.S. 1019 (1974) (treaty-reserved hunting and fishing rights on former reservation lands survived termination); *United States v. Adair*, 723 F.2d 1394 (9th Cir. 1983), *cert. denied*, 467 U.S. 1252 (1984) (same as to implied reserved water rights).

In 1986, Congress passed the Klamath Indian Tribe Restoration Act (the Restoration Act), Pub. L. No. 99–398, 100 Stat. 849 (Aug. 27, 1986) (codified at 25 U.S.C. § 566), reestablishing federal recognition of the Tribes.  While the Restoration Act restored the Tribes' federal services, as well as the government-to-government relationship between the Tribe and the United States, it did not alter existing property rights.  *See* 25 U.S.C. § 566(d).

---

[3]  The Klamath Judgment Distribution Act of 1965, Pub. L. No. 89–224, 79 Stat. 897 (codified, as amended, at 25 U.S.C. §§ 565–565g), addressed various claims that the Tribes had pursued against the United States.  The law authorized funds to be used in settling these claims. *Id*.  As part of this Act, the BIA could retain funds for the benefit of the Tribes "or any of its constituent parts or groups" for the purpose of "paying the usual and accustomed expenses of prosecuting claims against the United States."  25 U.S.C. § 565.

Throughout the post-termination and subsequent restoration period, the Klamath Claims Committee believed that it had broad authority to represent the Tribes and its members in tribal litigation.  Several resolutions of the Committee reflect this.  For example, a 1983 resolution that states that the Tribes' August 21, 1961, grant of authority designated the Klamath Claims Committee as "the post-termination representative body of the Tribe" with respect to the "supervision and management of tribal claims against the United States for all dealings." Klamath Claims Committee Resolution, January 1983; *see also* Klamath Claims Committee Resolutions, June 1996; Klamath Claims Committee Resolution, May 1996.  In 1993, the Tribes authorized plaintiff to work with BIA to disburse judgments from cases in which plaintiff, acting on behalf of the 1954 membership, was successful.  *See* Klamath Tribe Executive Resolution, July 1993.  More recently, the governing body of the Tribes authorized the Klamath Claims Committee to use funds to "pursue claims, including but not limited to claims now being prosecuted against PacifiCorp." *See* Joint Resolution of Tribal Council, March 2008.[4]  This resolution, however, did not give the Committee exclusive authority to pursue the Pacificorp litigation, as it envisioned that the Tribes would also participate in that litigation.  *Id.*  The same resolution indicated that, to the extent that the Klamath Claims Committee pursued "other claims" outside of the Pacificorp case, it must act "within [its] authority as established by the General Counsel." *Id.*[5]

In the late 1980s, Interior determined that the Dam and its fish ladder were adversely affecting several fish species listed as "endangered" under the Endangered Species Act of 1973, 87 Stat. 884, 16 U.S.C. § 1531 *et seq*.  In 2001, Congress authorized a study to assess alternatives for improving fish passage at the Dam.  *See* Farm Security and Rural Investment Act of 2002, Pub. L. No. 107–171, § 10905, 116 Stat. 134, 537.  After consulting with the MPID and the Tribes, Interior determined that the best course of action was removing the Dam.  In 2006, BIA negotiated a cooperative agreement with MPID under which Interior would pay to  remove the Dam and construct an alternative electric pump plant for irrigation.  MPID landowners voted in favor of Dam removal, and signed a cooperative agreement with the BIA.  The Dam was removed in August 2008.

Plaintiff filed its initial complaint in this court on February 6, 2009, and an amended complaint on March 17, 2009.  The latter advances four causes of action: (i) a takings of Indian

---

[4]  In their suit against Pacificorp, the Tribes sought damages for the disruption of salmon fish runs resulting from the construction and operation of government-authorized hydroelectric dams on the Klamath River.  *See Klamath Tribes of Or. v. Pacificorp*, 2005 WL 1661821 (D.Or. July 13, 2005), *aff'd*, 268 Fed. Appx. 575 (9th Cir.), *cert. denied*, 555 U.S. 821 (2008).

[5]  The United States and the Tribes jointly filed water rights claims as part of Oregon's adjudication of the Klamath River Basin.  This adjudication will conclusively quantify, pursuant to the McCarran Amendment, the water rights recognized in *Adair* and held in trust by the United States for the Tribes.  43 U.S.C. § 666; *United States v. Oregon*, 44 F.3d 758 (9th Cir. 1994), *cert. denied sub nom.*, *Klamath Tribe v. Oregon*, 516 U.S. 943 (1995).

trust assets based on the government's failure to reimburse the Tribes as authorized by section 13 of the 1954 Act; (ii) a breach of fiduciary duty based on the failure to disburse the section 13 authorized funds; (iii) a takings based on the removal of the Chiloquin Dam and its associated water storage; and (iv) a breach of fiduciary duty based on the removal of the Dam and its associated water storage.  Plaintiff asserted that this court possesses jurisdiction over these claims under the Indian Tucker Act, 28 U.S.C. § 1505.  On May 7, 2009, defendant filed a motion to dismiss under RCFC 12(b)(1) and (6).

On February 11, 2011, the court granted, in part, defendant's motion.  It held that plaintiff's claims involving the disbursements required by section 13 of the 1954 Act and relating to the transfer of the Chiloquin Dam fell far outside the six-year statute of limitations established by 28 U.S.C. § 2501, and thus must be dismissed for lack of jurisdiction.  *See Klamath Tribe Claims Comm. v. United States*, 97 Fed. Cl. 203, 209 (2011) (*Klamath Tribe Claims Comm. I*).  The court, however, held that it had jurisdiction over the remainder of plaintiff's claims relating to the removal of the Dam in August of 2008.  *Id*. at 210.  As to those claims, the court concluded that the Tribes "are a party that should be joined to this action under RCFC 19(a)."  *Id*. at 213.  In this regard, the court noted that "there is an overlap between the membership and interests of the Tribes and the Klamath Claims Committee, particularly after the passage of the Restoration Act in 1986."  *Id*. at 212.  Observing that "the Tribes currently possess fishing and water rights that derive from the 1864 Treaty," the court noted that it is "essentially those same rights and associated fiduciary obligations – deriving from the same 1864 Treaty – that plaintiff seeks to vindicate in this case."  *Id*.  Despite this, it found that in communications with plaintiff's counsel, the Chairman of the Tribes had indicated that he was "'not in a position to lend support to litigation over which the Klamath Tribes have no control, particularly where the litigation may potentially affect Tribal rights of the entire General Council membership.'"  *Id.*  (quoting a letter from the Chairman of the Tribes).

"Based on these facts," the court concluded that "in the absence of the Tribes, it cannot afford complete relief as between plaintiff and the United States."  *Id.*  It further found "that the Tribes has claimed an interest in the remaining subject matter of this lawsuit and that disposing of this case in the Tribes' absence may, as a practical matter, impede the Tribes' ability to protect that interest or leave the United States subject to inconsistent obligations."  *Id*. at 212-13.  Because the Tribes is a sovereign, the court determined that the appropriate process was to extend an invitation to the Tribes to intervene in this case under RCFC 24.  *Id*. at 214.  The court stated that if the Tribes declined that invitation, it would determine whether the Tribes was "indispensable," further observing that if this was so, the case would then be dismissed under RCFC 19(b).  *Id*.

On April 20, 2011, the Klamath Tribes responded to this court's invitation, declining to intervene in this matter.  This response, nonetheless, asserted that the Tribes "have an interest in the remaining subject matter of this lawsuit" and that "disposing of this case in the Tribes' absence may, as a practical matter, impede the Tribes' ability to protect that interest."  Lastly it indicated that "the Plaintiff Claims Committee has no authority to speak for or represent the

Tribes."[6]  On August 11, 2011, following the death and replacement of plaintiff's counsel, this court ordered the parties to file simultaneous briefs addressing whether the Tribes were indispensable under RCFC 19(b).  In an *amicus* filing, the Tribes "expressly reserve[d] its sovereign immunity from suit in this action," declaring the rights at issue to be ones "that belong to the Tribes."  This *amicus* brief further claimed that plaintiff is "in fact acting hostilely to the Tribes, asserting control over tribal rights, and inviting this Court to de-legitimize the Tribes."

The parties' briefing on the RCFC 19(b) issue is now completed.  Argument is deemed unnecessary.

## II.    DISCUSSION

Indian tribes possess "the common-law immunity from suit traditionally enjoyed by sovereign powers."  *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978); *see also Kiowa Tribe v. Mfg. Techs., Inc.*, 523 U.S. 751, 753-54 (1998).  Like all sovereigns, they are free to assert or to waive their immunity, as they see fit.  *Okla. Tax Comm'n v. Citizen Band Potowatomi Indian Tribe*, 498 U.S. 505, 509 (1991).  One aspect of this immunity is that a tribe "cannot be haled into court against its will, even as a plaintiff."  *Klamath Claims Comm. I*, 97 Fed. Cl. at 213.[7]  In this case, the Tribes has refused an invitation to intervene in this action under RCFC 24.  In that situation, the court must determine whether dismissal here is warranted under RCFC 19(b).  *See Klamath Claims Comm. I*, 97 Fed. Cl. at 213-14; *see also Narragansett Tribe of Indians v. S.R.I. Land Dev. Corp.*, 418 F. Supp. 798, 810-11 (D.R.I. 1976).

Under RCFC 19(b), "[i]f a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."  Specifically, the rule indicates that, in making this determination, factors for the court to consider include:

---

[6]  On February 19, 2011, the Tribes' General Council passed Klamath Tribes General Council Resolution # 2011-011, entitled "General Council Resolution Rescinding General Council Resolution #2004-002 and Reaffirming General Council Authority Over Claims of the Klamath Tribe."  This resolution rescinded a prior resolution on which plaintiff had relied in asserting that it could litigate the subject case.  The February resolution further stated that "the General Council reaffirms that the Claims Committee does not speak for or represent the Klamath Tribes, nor has it ever done so."

[7]  *See also Clinton v. Babbitt*, 180 F.3d 1081, 1090 (9th Cir. 1998) ("because the Hopi Tribe enjoys sovereign immunity . . . it cannot be joined as a party without its consent"); *Kescoli v. Babbitt*, 101 F.3d 1304, 1310 (9th Cir. 1996); *Wichita & Affiliated Tribes of Okla. v. Hodel*, 788 F.2d 765, 771 (D.C. Cir. 1986) ("tribal immunity quickly surfaces as a crucial issue in such a suit since if the tribe is an indispensable party, and cannot be joined due to its immunity, the claim may not proceed").

(1)  the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

(2)  the extent to which any prejudice could be lessened or avoided by:

   (A)  protective provisions in the judgment;

   (B)  shaping the relief; or

   (C)  other measures;

(3)  whether a judgment rendered in the person's absence would be adequate, and

(4)  whether the person would have an adequate remedy if the action were dismissed for nonjoinder.

RCFC 19(b).[8]  This decision "is to be made in the light of pragmatic considerations."  Fed. R. Civ. P., Advisory Comm. notes (1966); *see also Roos v. Texas Co.*, 23 F.2d 171 (2d Cir. 1927), *cert. denied*, 277 U.S. 587 (1928); *H.H. Robertson Co. v. Lumbermen's Mut. Cas. Co.*, 94 F.R.D. 578, 579 (W.D. Pa. 1982), *aff'd*, 696 F.2d 982 (3d Cir. 1982).[9]  "It must be based on factors varying with the different cases," the Supreme Court has observed, "some procedural, some compelling by themselves, and some subject to balancing against opposing interests."  *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 119 (1968); *see also Pimentel*, 553 U.S. at 863 ("multiple factors must bear on the decision whether to proceed without a required person"); *Kickapoo Tribe of Indians of Kickapoo Reservation in Kansas v. Babbitt*, 43 F.3d 1491, 1495 (D.C. Cir. 1995).

---

[8]  Rule 19 formerly spoke in terms of "necessary" and "indispensable" parties.  It was altered in 2007 for "stylistic" reasons but the "substance and operation of the rule . . . are unchanged."  *Rep. of Philippines v. Pimentel*, 553 U.S. 851, 855-56 (2008).  The same can be said of the 2008 modification of the language of this court's rule.  For a discussion regarding the evolution of this rule, *see* Katherine Florey, "Making Sovereign Indispensable, *Pimentel* and the Evolution of Rule 19," 58 UCLA L. Rev. 667, 673-76 (2011) (hereinafter "Florey").

[9]  "In general, the rules of [Court of Federal Claims] are patterned on the Federal Rules of Civil Procedure," making "precedent under the Federal Rules of Civil Procedure . . . relevant to interpret rules of [Court of Federal Claims]."  *Pac. Nat'l Cellular v. United States*, 41 Fed. Cl. 20, 25 n.3 (1998).  As to Rule 19, the Federal Circuit has recently noted that "RCFC 19 is virtually identical to Fed. R. Civ. P. 19" and "[b]ecause our case law on RCFC 19 is limited, we rely on cases interpreting Fed. R. Civ. P. 19 in our analysis of what is a 'necessary' party under RCFC 19."  *United Keetoowah Band of Cherokee Indians v. United States*, 480 F.3d 1318, 1324 n.2 (Fed. Cir. 2007).

In *Provident*, Mr. Justice Harlan, speaking for a unanimous Court, parsed the factors in Rule 19.  First, he noted, how the factors reflect the interests of the parties before the Court –

> First, the plaintiff has an interest in having a forum.  Before the trial, the strength of this interest obviously depends upon whether a satisfactory alternative forum exists. . . .  Second, the defendant may properly wish to avoid multiple litigation, or inconsistent relief, or sole responsibility for a liability he shares with another.

*Id*. at 109-10.  Also manifest in the factors, Justice Harlan wrote, "is the interest of the outsider whom it would have been desirable to join."  *Id*. at 110.   On this point, the *Provident* Court expounded –

> Of course, since the outsider is not before the court, he cannot be bound by the judgment rendered.  This means, however, only that a judgment is not *res judicata* as to, or legally enforceable against, a nonparty.  It obviously does not mean either (a) that a court may never issue a judgment that, in practice, affects a nonparty or (b) that (to the contrary) a court may always proceed without considering the potential effect on nonparties simply because they are not 'bound' in the technical sense.  Instead, as Rule 19(a) expresses it, the court must consider the extent to which the judgment may 'as a practical matter impair or impede his ability to protect' his interest in the subject matter.

*Id*. at 110-11.  Finally, "there remains the interest of the courts and the public in complete, consistent, and efficient settlement of controversies," which implicates the "public's stake in settling disputes by wholes, whenever possible, for clearly the plaintiff, who himself chose both the forum and the parties defendant, will not be heard to complain about the sufficiency of the relief obtainable against them."  *Id*. at 111.[10]

---

[10]   As the Fifth Circuit indicated shortly after *Provident* was decided, the essence of Rule 19 is to balance the rights of all those whose interests are implicated by the action:

> The plaintiff has the right to "control" his own litigation and to choose his own forum.  This "right" is, however, like all other rights, "defined" by the rights of others.  Thus the defendant has the right to be safe from needless multiple litigation and from incurring avoidable inconsistent obligations.  Likewise the interests of the outsider who cannot be joined must be considered.  Finally there is the public interest and the interest the court has in seeing that insofar as possible the litigation will be both effective and expeditious.

*Schutten v. Shell Oil Co.,* 421 F.2d 869, 873 (5th Cir. 1970); *see also Universal Reinsurance Co., Ltd. v. St. Paul Fire and Marine Ins. Co.*, 312 F.3d 82, 88 (2d Cir. 2002); *Nichols v. Rysavy*, 809 F.2d 1317, 1332 (8th Cir.), *cert. denied*, 484 U.S. 848 (1987); *Tick v. Cohen*, 787 F.2d 1490, 1495 (11th Cir. 1986); Matthew L.M. Fletcher, "The Comparative Rights of Indispensable

That plaintiff lacks an adequate remedy if this suit is dismissed weighs against dismissal. This court has exclusive jurisdiction over the takings and breach of fiduciary duty claims that remain at issue in this case.  *See United States v. Tohono O'Odham Nation*, 131 S. Ct. 1723, 1729-31 (2011); *Trusted Integration v. United States*, 659 F.3d 1159, 1162 (Fed. Cir. 2011); *Morris v. United States*, 392 F.3d 1372, 1375 (Fed. Cir. 2004).  Conversely, a U.S. district court would lack jurisdiction to provide any relief to plaintiff under the Administrative Procedure Act, 5 U.S.C. §§ 702 and 704.[11]  Accordingly, if this suit is dismissed, plaintiff likely will be left without any ability to recoup compensation for the injuries it claims.  In such an instance, the decisional law indicates that this court should be "'extra cautious' before dismissing an action." *Kescoli*, 101 F.3d at 1310 (quoting *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990)).[12]

_____

Sovereigns," 40 Gonz. L. Rev. 1, 8-9 (2004) (hereinafter "Fletcher"); 7 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus, Fed. Prac. & Proc. Civ. § 1602 (2012).

[11]  In *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133 (2004), this court discussed why it believed that district courts lack jurisdiction over matters such as these, stating:

> [T]he Federal Circuit, in *Consolidated Edison Co. v. United States*, 247 F.3d 1378 (Fed. Cir. 2001) (en banc), instructed that "[a] party may not circumvent the [Court of Federal Claim's] exclusive jurisdiction by framing a complaint in the district court as one seeking injunctive, declaratory or mandatory relief where the thrust of the suit is to obtain money from the United States."  *Id.* at 1385 (quoting *Rogers v. Ink*, 766 F.2d 430, 434 (10th Cir. 1985)); *cf. Cobell v. Norton*, 240 F.3d 1081, 1094-95 (D.C. Cir. 2001).  Moreover, the Administrative Procedure Act waives sovereign immunity for district court suits only if "there is no other adequate remedy."  5 U.S.C. § 704 (2000).  Yet, to the extent that these other actions seek an accounting, that remedy is available here as a prelude to the award of monetary damages.  *See, e.g., Minnesota Chippewa Tribe Red Lake Band v. United States*, 768 F.2d 338, 342 (Fed. Cir. 1985); *Klamath and Modoc Tribes v. United States*, 174 Ct. Cl. 483, 486-91 (1966) (construing 28 U.S.C. § 1505); *see also United States v. Mitchell*, 463 U.S. 206, 219-22 (1983).

More recently, the Federal Circuit has made clear that a compensation award in this court provides most plaintiffs with an "adequate remedy," thereby precluding a district court from exercising jurisdiction over a related claim under 5 U.S.C. § 704.  *See Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 480 F.3d 1116, 1126-27 (Fed. Cir. 2007); *Consol. Edison Co.*, 247 F.3d at 1384-85.

[12]  *See also Sac and Fox Nation of Missouri v. Norton*, 240 F.3d 1250, 1260 (10th Cir. 2001), *cert. denied*, 534 U.S. 1078 (2002); *Bassett v. Mashantucket Pequot Tribe*, 204 F.3d 343, 358 (2d Cir. 2000); *Pasco Int'l (London) Ltd. v. Stenograph Corp.*, 637 F.2d 496, 501 n.9 (7th

But, there are countervailing considerations here.  Courts generally afford sovereigns "heightened protection" if a lawsuit poses "a potential of injury to the sovereign's interest." *Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel*, 657 F.3d 1159, 1181 (11th Cir. 2011), *cert. denied,* 132 S. Ct. 2379 (2012).  This consideration has often led courts to dismiss in cases where the United States is the absent party.  *See Mine Safety Appliances Co. v. Forrestal*, 326 U.S. 371, 375 (1945); *State of Minnesota v. United States*, 305 U.S. 382, 388-89 (1939).  And there likewise is a "strong policy that has favored dismissal when a court cannot join a tribe because of sovereign immunity."  *Davis v. United States*, 192 F.3d 951, 960 (10th Cir. 1999), *cert. denied*, 542 U.S. 937 (2004).[13]  Indeed, "[w]hen . . . a necessary party . . . is immune from suit, there is very little room for balancing of other factors set out in Rule 19(b), because immunity may be viewed as one of those interests compelling by themselves."  *Enterprise Mgmt. Consultants, Inc. v. United States ex rel. Hodel*, 883 F.2d 890, 894 (10th Cir. 1989) (quoting *Wichita & Affiliated Tribes*, 788 F.2d at 777 (quoting 3A Moore's Federal Practice ¶ 19.15, at 19-266 n.6 (1984)).[14]  While "this does not mean that balancing can be completely avoided simply because an absent person is immune from suit," it does mean that "the plaintiff's inability to obtain relief in an alternative forum is not as weighty a factor when the source of that inability is a public policy that immunizes the absent party from suit."  *Davis ex rel. Davis v. United States*, 343 F.3d 1282, 1293-94 (10th Cir. 2003), *cert. denied*, 542 U.S. 937 (2004); *see also N. Arapaho Tribe v. Harnsberger*, 660 F. Supp. 2d 1264, 1283 (D. Wyo. 2009).

---

Cir. 1980) (indicating that "the absence of an alternative forum would weigh heavily, if not conclusively against dismissal").

[13]   *See also Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 553 (4th Cir. 2006); *American Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1025 (9th Cir. 2002) ("we have regularly held that the tribal interest in immunity overcomes the lack of an alternative remedy or forum for the plaintiffs"); *Keweenaw Bay Indian Cmty. v. State*, 11 F.3d 1341, 1347-48 (6th Cir. 1993) (in case involving fishing rights under treaty, equity required case to be dismissed where two absent bands were indispensable where adequate remedy was available); Florey, *supra* at 684-85 ("cases from the tribal context continue to form the bulk of cases in which courts contemplate dismissal because an immune Rule 19 party cannot be joined"); Fletcher, *supra*, at 14 ("For the most part, courts dismiss a case when an absent tribe has a significant stake in the outcome of the litigation."); Nicholas V. Merkely, "Compulsory Party Joinder and Tribal Sovereign Immunity: A Proposal to Modify Federal Courts' Application of Rule 19 to Cases Involving Absent Tribes as 'Necessary' Parties," 56 Okl. L. Rev. 931, 939 (2003) ("When applying Rule 19 to cases involving Indian tribes, courts generally dismiss suits because the tribes' sovereign immunity renders joinder infeasible.").

[14]   Other courts have employed similar reasoning.  *See also Seneca Nation of Indians v. New York*, 383 F.3d 45, 48 (2d Cir. 2004), *cert. denied*, 547 U.S. 1178 (2006); *Kickapoo Tribe*, 43 F.3d at 1496; Florey, *supra* at 686.

Recently, in *Pimentel*, 553 U.S. 851, the Supreme Court elaborated on the importance of sovereign immunity plays in the balancing analysis required by Rule 19(b). In that case, various parties claimed assets in a Merrill Lynch brokerage account that included funds which allegedly had been illicitly obtained by former Philippines President Marcos. *Id*. at 857. Originally, the Republic of the Philippines and a sovereign Filipino Commission were included as defendants in the action, via interpleader, but were later dismissed after they successfully invoked the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1604, 1609. *Id*. at 859. After this dismissal, the district court awarded the funds to another party. *Id*. at 860. The Ninth Circuit affirmed this ruling, holding that while the Republic and the Commission were necessary parties under Rule 19(a) and entitled to be dismissed based on sovereign immunity, their claim to the disputed assets was unlikely to succeed on the merits.[15] The Supreme Court reversed, holding that the lower courts erred in their analysis of Rule 19(b) because they had "not accord[ed] proper weight to the compelling claim of sovereign immunity." *Pimentel*, 553 U.S. at 869. Framing the rationale of the Court, Justice Kennedy stated that cases "involving the intersection of joinder and the governmental immunity of the United States . . . instruct us that where sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign." *Id*. at 867. Recognizing that "[d]ismissal under Rule 19(b) will mean, in some instances, that plaintiff will be left without a forum for definitive resolution of their claims," the Court, nonetheless, concluded that this "result is contemplated under the doctrine of foreign sovereign immunity." *Id*. at 872.

While *Pimentel* is, in some regards, distinguishable,[16] it, nevertheless, illustrates that sovereign immunity often will be compelling itself in swaying the Rule 19(b) analysis. *Pimentel* stands for the proposition that where a sovereign party should be joined in an action, but cannot be owing to sovereign immunity, the entire case must be dismissed if there is the potential for the interests of the sovereign to be injured. And this result obtains even when no alternative forum exists in which the plaintiff can press its case. As subsequent cases confirm, this rationale applies to domestic sovereigns, *i.e.*, States and Indian nations, as much as it does to foreign sovereigns, *e.g.*, the Philippines. *See Vann v. Salazar*, 2011 WL 4953030, at *3-4 (D.D.C.

---

[15]   *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. ENC Corp.*, 464 F.3d 885 (9th Cir. 2006); *In re Republic of Philippines*, 309 F.3d 1143, 1149-52 (9th Cir. 2002).

[16]   Among other things, the Court there cited deference to the comity and dignity interests of the Republic and the Commission "in determining if, and how, the assets should be used to compensate those persons who suffered grievous injury under Marcos" and the desirability of avoiding the "specific affront that could result to the Republic and the Commission if the property they claimed is seized by the decree of a foreign court." *Pimentel*, 553 U.S. at 866.

2011); *N. Arapaho Tribe*, 660 F. Supp. 2d at 1287; *see also A123 Sys., Inc. v. Hydro-Quebec*, 626 F.3d 1213, 1221 (Fed. Cir. 2010).[17]

This rationale weighs heavily in favor of dismissing this case owing to the absence of the Tribes. Although the Tribes has decided not to intervene, it has asserted a nonfrivolous interest in the subject matter of this suit that might be impaired by an adverse ruling in this case. Even without a direct preclusive effect,[18] such a ruling would be a negative precedent that the Tribes would have to confront in future litigation involving the 1864 Treaty and the associated statutes. *See Acton Co., Inc. of Mass. v. Bachman Foods, Inc.*, 668 F.2d 76, 78-79 (1st Cir. 1982) ("Even if Acton would not be legally bound, an adverse ruling would be persuasive precedent in a subsequent proceeding, and would weaken Acton's bargaining position for settlement purposes."); *Doty v. St. Mary Parish Land Co.*, 598 F.2d 885, 887 (5th Cir. 1979) (dismissing case under Rule 19(b) because "an unfavorable judgment in the present case would constitute precedent adverse to the [absent party's] claims"); *Johnson & Johnson*, 720 F. Supp. at 1123-25 (same). And that negative precedent could ripen into binding adverse precedent were this court's ruling affirmed by the Federal Circuit. Thus, it would appear that to proceed without the Tribes might "as a practical matter impair or impede" the Tribe's ability to protect its sovereign interests. *See* RCFC 19(a); *Provident*, 390 U.S. at 110 (stating that when considering the "interest of the outsider whom it would have been desirable to join," the court should consider the "practical" impact of a judgment on that interest); *Picciotto v. Continental Cas. Co.*, 512 F.3d 9, 16-17 (1st Cir. 2008).

Adding weight to that conclusion is the fact that any disposition here in the Tribes' absence threatens to leave defendant subject to multiple and conflicting claims with respect to the same fishing and water rights conferred by the 1864 Treaty. Plaintiff and the Tribes, whose memberships are different,[19] assert at least partially overlapping claims to those rights. To the

---

[17] For nearly two centuries, the Supreme Court has described Indian tribes as "domestic dependent nations." *Cherokee Nation v. Georgia*, 5 Pet. 1, 17 (1831) (Marshall, C.J.); *see also United States v. Lara*, 541 U.S. 193, 204-05 (2004).

[18] As several courts have noted, it is difficult to determine the preclusive effect of a ruling in later lawsuit. That is particularly true here given the debates regarding the legal relationship between plaintiff and the Tribes. *See Huber v. Taylor*, 532 F. 3d 237, 250 (3d Cir. 2008) ("[i]t would be premature for this Court to endeavor to decide whether [the absent party is] in privity in bringing the instant action, for purposes of determining the preclusive effect of this action on a later lawsuit, where the potential later lawsuit is yet to be brought, and where the instant action has not even run its course yet") (quoting *Johnson & Johnson v. Coopervision, Inc.*, 720 F. Supp. 1116, 1124 (D. Del. 1989)).

[19] While plaintiff and the Tribes dispute the precise contours of the other's membership, they both agree that an award to the other would provide a windfall to unentitled individuals while denying certain entitled individuals a share. Given this, it is apparent that if the Tribes had intervened in this action, the court would have been forced to determine how to allocate any

extent, moreover, that the Tribes' claims hinge on the removal of the Chiloquin Dam, the statute of limitations under 28 U.S.C. § 2501 is still open and will remain so until August of 2014. *See Klamath Tribes Claims Comm. I*, 97 Fed. Cl. at 210. Accordingly, if this suit proceeds, the United States could find itself subject to competing claims for the same compensation. For this and other reasons, this is not a case in which the interests of the Tribes may be adequately represented by the United States. *Id.* at 213 n.16.[20] *Per contra.* Indeed, in numerous recent cases, the United States has urged this court to construe narrowly the trust and treaty responsibilities it owes to various Tribes, both for jurisdictional and merits purposes. *See, e.g., Jicarilla Apache Nation v. United States*, 100 Fed. Cl. 726 (2011). There is no reason to believe that defendant will be any less zealous in pressings its claims in this case, with obvious implications for the Tribes if the United States were to prevail on these points. *See Provident*, 390 U.S. at 110.[21] Nor does this court see any way that, under RCFC 19(b)(2), "any prejudice could be lessened or avoided" if this suit were allowed to proceed.

---

resulting judgment, requiring it to wade into disputes not only between the claimants and the United States, but also among the claimants themselves. *See Makah Indian Tribe*, 910 F.2d at 559-61 (holding absent tribe was indispensable where case involved "potential intertribal conflict").

[20] *See also SW. Ctr. for Biological Diversity v. Babbitt*, 150 F.3d 1152, 1154 (9th Cir. 1998); *Ramah Navajo School Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1351-52 (D.C. Cir. 1996); *Citizens Against Casino Gambling in Erie County v. Kempthorne*, 471 F. Supp. 2d 295, 315 (W.D. N.Y. 2007).

[21] To be sure, the court is discomforted by the prospect of dismissing a suit in which the Tribes has claimed that its interests may be impaired, but, nonetheless, has elected not to intervene. But, at least in tribal cases, the weight of authority takes the view that an essential aspect of sovereignty is to decide when *not* to assert an interest in the suit. *See Kickapoo Tribe*, 43 F.3d at 1498 ("[f]ailure to intervene is not a component of the prejudice analysis where intervention would require the absent party to waive sovereign immunity"); *Pueblo of Sandia v. Babbitt*, 47 F. Supp. 49, 54 (D.D.C. 1999); *cf. School Dist. of City of Pontiac v. Sec'y of U.S. Dept. of Educ.*, 584 F.3d 253, 281 (6th Cir. 2009), *cert. denied*, 130 S. Ct. 3385 (2010) ("When States stick their heads in the sand for nearly five years of litigation about a high-profile lawsuit, it is difficult to say that proceeding without them will impair their interests – which so far seem focused above all on *not* being forced to take a public stand on the issues presented."); *see also* Florey, *supra* at 686-87 ("When considering the extent of Rule 19(b) prejudice to a party, some courts have cautioned against attaching any weight to an immune party's failure to intervene."); One can imagine a number of reasons why politically, legally, tactically or practically, the Tribes may wish not to assert their rights in a given suit. *See* Fletcher, *supra*, at 121-123; *see generally*, Angela Riley, "Good (Native) Governance," 107 Colum. L. Rev. 1049, 1111-13 (2007) (discussing situations in which tribes have and have not waived their sovereign immunity).

Accordingly, a majority of the factors in RCFC 19(b) weigh heavily in favor of holding the Tribes an indispensable party.  As such, the court finds that the Tribes is not only a necessary party, but also an indispensable one, compelling dismissal.[22]

## III.    CONCLUSION

The court will not gild the lily.  For the foregoing reasons, the court hereby orders the Clerk to **DISMISS** plaintiff's complaint.  No costs.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

---

[22]  Because of this ruling, the court will deny, as moot, a motion filed by plaintiff to amend its complaint.